UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OMNITRACS, LLC, et al.,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>MOTIVE TECHNOLOGIES, INC.,<br><br>　　　　　Defendant. | Case No. 23-cv-05261-RFL<br><br>**ORDER ON POST-TRIAL MOTIONS**<br>Re: Dkt. Nos. 486, 489 |

On April 24, 2025, the jury returned a verdict in this patent infringement case that Motive Technologies Inc. ("Motive") did not infringe the asserted claims of the '906, '628, '060, and '253 Patents owned by Plaintiffs ("Omnitracs"). While the jury found that the asserted claims of the '906 and '628 Patents were not invalid, it found that they "involve only activities which a person of ordinary skill in the art would have considered to be well-understood, routine, and conventional at the time the patent application was filed." (Dkt. No. 473 at 6.)

The parties now move for post-trial relief. Motive moves for judgment as a matter of law that the asserted claims of the '628 and '906 Patents are ineligible under 35 U.S.C. § 101. Omnitracs moves for judgment as a matter of law that the asserted claims of the '628, '060, and '253 Patents are infringed, and that the asserted claims of the '628 and '906 Patents are not well-understood, routine, and conventional. Omnitracs further moves for a new trial on all issues. For the reasons described below, the Court **GRANTS** Motive's motion and **DENIES** Omnitracs' motion.

I.　**MOTIVE'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

The parties dispute what standard should be used to evaluate Motive's motion.

1

Omnitracs argues that the jury's verdict that the asserted claims of the '628 and '906 Patents were "well understood, routine, and conventional" was merely advisory, and that Rule 52(a)(1) should apply. *See* Fed. R. Civ. Pro. 52(a)(1) ("In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately."). In support, Omnitracs points out that it stated multiple times during pre-trial proceedings and trial that the question at issue was advisory and that Motive did not contest these statements. (*See e.g.*, Dkt. No. 430 at 21:16-22 (Omnitracs stating that for "the 101 issue" "the jury's verdict form will be advisory").) Omnitracs also emphasizes that the verdict form itself does not mention the ultimate question of eligibility. However, the Court has never stated that the question was advisory, and nothing in the verdict form indicated that the jury was not rendering a finding of fact on this issue. Omnitracs cites no authority stating that Motive's failure to object to Omnitracs' characterizations constitutes waiver or overrides the clear intention of the Court. Therefore, Motive's motion is properly evaluated under Rule 50(b).

Under Rule 50(b), a court may grant a renewed motion for judgment as a matter of law. When the jury returns a verdict, the "jury's verdict must be upheld if it is supported by substantial evidence." *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001). The Court may not weigh evidence or order a result it finds more reasonable if substantial evidence supports the jury verdict. *Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873, 877 (9th Cir. 1984). "When a special verdict is sought from a jury, the appropriate procedure is for the court to accept the findings of fact explicitly made or implicit in the jury's answers and, based thereon and on such additional findings as the court may find necessary to make [] direct entry of judgment under Rule 58." *Quaker City Gear Works, Inc. v. Skil Corp.*, 747 F.2d 1446, 1452 (Fed. Cir. 1984).

### A.     Eligibility of the '628 Patent

#### 1.     Step One

The Court previously held that the asserted claims of the '628 Patent are directed to an abstract idea, and though it is free to reassess its rulings prior to entry of judgment, it sees no

reason to deviate from that holding.  Whether a claim is directed to an abstract idea is a determination of law based on the claim language and specification.  *Hawk Tech. Sys., LLC v. Castle Retail, LLC*, 60 F.4th 1349, 1356-57 (Fed. Cir. 2023).  In its Order denying Motive's motion for judgment on the pleadings, the Court explained that "[t]he asserted '628 patent claims are directed at the abstract idea of receiving, associating, and presenting data because they only 'require the collection, analysis, and display of available information' in the fleet management field and state 'those functions in general terms, without limiting them to technical means for performing the functions that are arguably an advance over conventional computer and network technology." (Dkt. No. 131 at 7-8 (*citing Elec. Power*, 830 F.3d at 1351); *accord Immersion Corp. v. Fitbit, Inc.*, 313 F. Supp. 3d 1005, 1028-29 (N.D. Cal. 2018).)  Nothing at trial changes that determination.

Omnitracs argues that the evidence at trial showed that the asserted '628 patent claims are directed to a novel two-device hardware solution and that such a system enabled numerous benefits.  The Court, however, was already aware of this two-device hardware solution and considered its benefits when it issued its Order.  (Dkt. No. 131 at 8-9.)  Moreover, the presence of two generic computer components—a "data acquisition device" and a "portable wireless data transfer and display device"—does not preclude a finding that the claims are directed to an abstract idea.  *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 612-14 (Fed. Cir. 2016) (finding that the claimed computer components served merely as a "conduit" for implementing the abstract idea).  Nor do unclaimed benefits render a claim patent-eligible where the claims involve only "result-based functional language." *Immersion*, 313 F. Supp. 3d at 1028-29; *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015) (explaining that a claim may be patent ineligible even if it improves accuracy or efficiency).

2. **Step Two**

If the claims are directed to an abstract idea under step one, the Court then asks whether the claims embody some "inventive concept."  Claims fail the second step of the *Alice* test when, viewed individually or as an ordered combination, the limitations "merely recite well-

understood, routine, conventional activities." *Miller Mendel, Inc. v. City of Anna, Texas*, 107 F.4th 1345, 1353 (Fed. Cir.), *cert. denied*, 145 S. Ct. 593 (2024).  The Court previously declined to enter judgment on the step two inquiry as there were "factual questions about whether the decision to split the functionality of the vehicle event recorder into an onboard recorder (*e.g.*, the dash cam) and separate portable unit (*e.g.*, the cell phone) was non-generic and unconventional." (Dkt. No. 131 at 9.)  Because the jury found that the asserted claims were "well-understood, routine, and conventional at the time the patent application was filed," and substantial evidence supports that verdict, the asserted claims of the '628 Patent also fail step two of the *Alice* test. (Dkt. No. 473 at 6.)

During trial, Motive presented evidence that the prior art, including the Turnpike system and the '568 Patent, used a similar two-device hardware solution and was widely available at the time.  (Dkt. No. 493-158 (Ex. 3050), fig. 2 ('568 Patent); Trial Tr. at 1313:19-1314:4 (Turnpike).)  For example, the Turnpike system was commercially sold and installed in over 5,800 vehicles by the time the '628 patent application was filed in 2012.  (Dkt. No. 493-6 (Ex. 8) at 553.)  There is also evidence that the 2010 Department of Transportation (DOT) regulations themselves—which were described in the testimony as being widely known throughout the industry—referenced "mobile phone solutions" used with electronic on-board recorders, a type of data acquisition device.  (Dkt. No. 493-218 (Ex. 4147) at 23-24.)  Even Omnitracs' witness Sekula agreed that "the '906 and '628 inventors were not the first to create a fleet management system that used an in-vehicle device to communicate over Bluetooth to a mobile device that communicated over cellular network to the back-end laptop or back-end servers." (Trial Tr. at 324:20-325:4.)  Taken together with Motive's expert Wilson's testimony, the jury had more than sufficient evidence to conclude that the two-device system was well-understood, routine, conventional.  (Trial Tr. at 1312:15-1313:23.)

Omnitracs argues that Claim 17, which depends on Claim 15, adds requirements that

4

provide an "inventive concept."[1]  Claim 17 recites sending data at "predetermined times" rather than in real-time, which Omnitracs claims is an inventive concept that improved the efficiency of data transfer.  However, the specification states that "predetermined times" includes sending data in "real-time."  (Dkt. No. 493-2 (Ex. 3) at 9:4-10 ("Remote control center 104 is configured to receive . . . the driver summary electronic report, at predetermined times, such as at real-time.").)  And even if "predetermined times" was construed as excluding real-time, substantial evidence supports the jury's verdict that sending data in that manner was routine, conventional, and well-understood.  Mr. Znidarsic testified that the Turnpike source code, for example, indicated that its systems sent data every seven seconds.  (Trial Tr. at 1275:20-1276:5; *see also* Dkt. No. 485-12 at 184:12-185:18 (inventor Mohn stating that Turnpike sent information to the network at periodic times).)

### B.      Eligibility of the '906 Patent

#### 1.      Step One

For the same reasons as with the '628 Patent, the asserted claims of the '906 Patent are directed to a patent-ineligible abstract idea.  Independent Claim 10 recites a method comprising four functional steps: (i) "receiving" data, (ii) "processing" the data into a report with a composite driver score based on certain factors, (iii) "sending" the report, and (iv) "presenting" the report.  Independent Claim 1 similarly recites a "network device" comprising generic computer components—a "network communication module," "processor," and "display"—that are "configured to" perform these same method steps, with the additional step of "storing" some of the data in "memory."  These claims, like those in the '628 Patent, are directed to the abstract idea of receiving, analyzing, and displaying information in the context of fleet management.  *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016).  The specification further explains that virtually any standard computing environment, such as a "standard server,"

---

[1] Omnitracs does not appear to contend that dependent Claim 18, which requires receiving a unique vehicle identification of the vehicle and associating the vehicle data and driver information, supplies a further "inventive concept."

5

"group of such servers," "rack server system," or "personal computer such as a laptop computer," can be used to implement the claimed invention. (Dkt. No. 493-1 (Ex. 1) at 24:57-25:23, 25:58-64.) Thus, these claims do not recite any particular improvement in how these components operate, nor do they provide a specific or unconventional way of processing or presenting the data.

Omnitracs argues that the claims are directed to a novel two-device hardware solution. But this argument is even less convincing here than for the '628 Patent. Such a two-step hardware configuration is not meaningfully recited in the asserted claims. Apart from Claim 15, which references a "data acquisition device," none of the claims require a second device, and even Claim 15 does not require the involvement of a separate "data acquisition device." (*See* Dkt. No. 493-1 (Ex. 1) ("remotely updating . . . the at least one portable wireless data transfer and display device *or* at least one data acquisition device associated with the at least one portable wireless data transfer and display device" (emphasis added)).) Even if a two-step hardware system was sufficiently recited, for reasons discussed above, the presence of two generic computing devices—each operating according to routine and conventional functionality—does not preclude a finding that the claims are directed to an abstract idea. *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 612-14 (Fed. Cir. 2016).

Nor do the "composite scores" render the claims any less abstract. The Federal Circuit in *Electric Power Group* rejected the argument that calculating a "composite indicator of reliability" saved otherwise abstract claims, holding that such functionality still fell squarely within the realm of abstract ideas. 830 F.3d at 1351-54. Similarly, courts have found that claims reciting the generation of "efficiency scores" based on enumerated factors is directed to the abstract idea of "collecting, organizing and analyzing medical claims data" under *Alice* step one. *Cave Consulting Grp., Inc. v. Truven Health Analytics Inc.*, No. 15-cv-02177-SI, 2017 WL 6405621, at *6 (N.D. Cal. Dec. 15, 2017), *aff'd*, 756 F. App'x 997 (Fed. Cir. 2019).

Lastly, to the extent Omnitracs contends that the claims improve the interface between drivers and fleet managers, that improvement appears to be the end result of processing and

6

presenting data to users in a useful form, which—without more—is insufficient to establish patent eligibility under step one. *See In re Salwan*, 681 Fed. App'x. 938, 939-41 (Fed. Cir. 2017) (invalidating method claims that recited "receiving" information, "storing" information, "selectively retrieving [stored medical information], [and] generating one or more healthcare reports").

### 2. Step Two

The jury found that the asserted claims of the '906 Patent, "considered individually and as an ordered combination, involve only activities which a person of ordinary skill in the art would have considered to be well-understood, routine, and conventional at the time the patent application was filed." (Dkt. 473 at 6.) That verdict is supported by substantial evidence in the trial record. To the extent the asserted claims recite a two-part in-vehicle hardware solution and transmitting data at "predetermined times," Motive has presented evidence demonstrating that these elements are not inventive, as explained above.

Nor does Claim 15 fare any better. That claim recites a method of "remotely updating, by the processor via the long-range wireless network, the . . . portable wireless data transfer and display device or . . . [a] data acquisition device[.]" (Dkt. No. 493-1 (Ex. 1).) Substantial evidence supports the jury's determination that updating software remotely is itself a conventional function in multi-device systems. As Wilson testified, "updating an app on a cell phone" was "pretty routine" as of 2012. (Trial Tr. at 1322:19-1323:1; *see also id.* at 1339:15-24 (noting that Turnpike provided remote updates).) Thus, Claim 15 merely recites the same abstract functionality as the independent claims—gathering and processing data using standard hardware—with the addition of a well-understood, routine, and conventional feature.

## II.   OMNITRACS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

### A.   Infringement of the '628 Patent

The jury's conclusion that Motive did not infringe the asserted claims of the '628 Patent is supported by substantial evidence. Specifically, a reasonable jury could find that Motive's

accused products did not meet the limitations of Claim 15, which includes the step of "sending the driver summary electronic report through a long range wireless communication module to a remote network device via a long-range wireless network." (Dkt. No. 493-2 (Ex. 3) at 43.) During claim construction, the Court agreed with Omnitracs that "driver summary electronic report" should be construed according to its plain and ordinary meaning. (Dkt. No. 185 at 22.). The jury was instructed to that effect. (Dkt. No. 465-1 at 7.)

At trial, several Motive witnesses testified that while some of the information comprising the driver summary electronic report is sent to the backend, the actual report is not sent. (*See* Trial Tr. at 1310:11-13 (Wilson testifying that Motive products did not infringe because "there is no sending of . . . the Driver Summary Electronic Report, only sending data and information"); Trial Tr. at 1147:24-1148:22, 1149:5-16 (Motive employee Choi testifying that the "ELD messages" and "ELD events" sent to the backend "are just the data points used to create" the driver summary electronic reports, which are generated locally by the driver app and fleet dashboard); Trial Tr. at 1265:1-12 (Znidarsic stating that he "saw no source code that showed . . . the [driver summary electronic report] is sent from the driver app to the Fleet Dashboard").) Omnitracs' expert Dr. Wicker did not contest this source code analysis, but urged the jury to nonetheless find that the individual datapoints, taken together, constituted a driver summary electronic report. The jury could reasonably conclude from Motive's evidence that the data points sent to the backend did not constitute a driver summary electronic report within the ordinary meaning of the term. Nor does this conclusion contradict Dr. Wicker's testimony that the driver and vehicle data on the Driver App is "synced with the KeepTruckin server" (Trial Tr. at 652:24-654:20), as syncing may occur piecemeal via ELD messages.

Because substantial evidence supports a finding of non-infringement on this basis, the Court declines to consider the other bases outlined in the briefing.

### B. Infringement of the '060 Patent

There is substantial evidence to conclude that Motive did not infringe the asserted claims of the '060 Patent. The claims require that the accused functionality "facilitate wireless

communication of information between a web server in the vehicle event recorder [*i.e.*, the Vehicle Gateway] and a remotely located computing device using HTTP." (Dkt. No. 185 at 6.) At trial, Motive presented evidence that the Vehicle Gateway does not use HTTP to communicate when it is acting as a server. Motive's expert explained that though the VG communicates over HTTP, it does so as a web client. (*See* Trial Tr. at 1273:23-1274:2, 1446:7-8.) And while the evidence shows that the VG may also contain a server that receives and responds to requests, Motive engineer Gorski testified that the VG uses MQTT, rather than HTTP, to the perform those functions. (Trial Tr. at 1404:3-1405:21 (referring to Dkt. No. 493-169 (Ex. 3294)).) Znidarsic further clarified that the code Dr. Wicker relied on to show that the VG operated as an HTTP server, when viewed in context, actually demonstrated that the VG was opening a socket connection as a client. (Trial Tr. at 1272:23-1273:22.) Indeed, even Dr. Wicker admitted that the diagrams he examined "do[] not show the ELD receiving the request over HTTP." (Trial Tr. at 867:17-21.) Taken as a whole, this is sufficient for a reasonable jury to conclude that there is no web server in the VG that "us[es] HTTP" to communicate with the backend.

### C.    Infringement of the '253 Patent

There is sufficient evidence for the jury to reasonably conclude that the accused products did not "determine values of individual frames in the set of consecutive frames, wherein the values of the individual frames decrease with increasing time away from the particular time of the particular vehicle event" as required by the asserted claims of the '253 Patent. (Dkt. No. 493-4 (Ex. 5).) The evidence showed that Motive's AI Dashcam determines "confidence values" based on the likelihood that the camera's vision model detected an object, not time or proximity to "the particular vehicle event." (Trial Tr. at 1267:23-1268:20, 1406:6-21.)

Indeed, Motive identified many instances in which the values of the frames *increase* with increasing time away from the time of the event. For example, Gorski testified that as a car is pulling up to a stop sign, Motive's system will assign increasingly high confidence values to the frames as the stop sign becomes more easily detected. But once the car drives past the stop

sign—potentially triggering a "rolling stop event"—the confidence value will drop to zero because the stop sign is no longer in view. (Trial Tr. at 1407:4-24.) Similarly, Znidarsic demonstrated that the AI Dashcam may assign a medium confidence value to a frame containing a cell phone that is mostly obscured behind a hand, assign a low confidence value to the next frame in which the cell phone is fully obscured, and then assign a high confidence value to the following frame in which the cell phone is fully visible, thereby triggering a cell phone use event. (Trial Tr. at 1270:5-20.) While there may also be instances in which the values assigned to individual frames happen to decrease with increasing time away from the time of the event, as Omnitracs contends, there is more than sufficient evidence to conclude that Motive's system does not "determine" values on that basis as required by the claim.

### D. Patent Eligibility

Because the Court is granting Motive's motion for judgment as a matter of law on the same issue, Omnitracs' motion as to patent eligibility is denied for the same reasons stated above.

### III. OMNITRACS' MOTION FOR A NEW TRIAL

Under Rule 59, the Court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). A new trial should be granted when "the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000)). "Unlike a Rule 50 determination, a Rule 59 motion for a new trial does not require the district court judge to 'view the trial evidence in the light most favorable to the verdict. Instead, the district court can weigh the evidence and assess the credibility of the witnesses.'" *Cones v. Cnty. of Los Angeles*, No. CV 14-8281 PSG (PLAx), 2016 WL 7438817, at *7 (C.D. Cal. Sept. 28, 2016) (citing *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842 (9th Cir. 2014)).

### A. Motive's Reference to Khan's Muslim Identity

Motive's cross-examination of Dr. Wicker about why Motive used the "Frank Williams" alias when evaluating other companies—and subsequent reference to Khan's intent to hide his Muslim identity—was not improper or prejudicial. As the Court stated during trial, Omnitracs placed this issue "in a prominent position in the case" when it asked Dr. Wicker about Motive's use of the alias during direct examination. (Trial Tr. at 617:22-619:18 ("[T]here is no Frank Williams. As I understand it, this is an alias that was used by Mr. Khan to contact other companies."); *see also id.* at 822:4-8.) It was therefore "fair game" for Motive to cross-examine Dr. Wicker about the reason for use of the name and attempt to dispel Omnitracs' suggestion that Motive used deceptive tactics to gather business intelligence. (Trial Tr. at 822:9-11); *United States v. Whitworth*, 856 F.2d 1268, 1285 (9th Cir. 1988) ("[O]pening the door" to a particular issue by one party entitles the other party "to introduce evidence on the same issue to rebut any false impression that might have resulted from the earlier admission.").

Nor did Motive's counsel "misrepresent anything" during questioning. (Trial Tr. at 819:13-18.) Counsel's question about whether Wicker knew "Mr. Khan used an alias because he's Muslim, and he wanted to have a more American sounding name to interface with truckers" was grounded in Johns's deposition testimony. (Trial Tr. at 797:11-14.) As discussed outside the presence of the jury, Johns's deposition testimony, which Dr. Wicker admitted having an opportunity to review, stated that Khan was using an American name for his Muslim name. (Trial Tr. at 819:13-820:6.) As such, Motive had a good faith basis for asking the question about a topic that Omnitracs had put in issue, and no curative instruction was required. The reference did not violate the parties' stipulated Motion in Limine No. 2, as Khan was not a witness in the case. (Trial Tr. at 820:7-9.)

Omnitracs contends it was also prejudiced by Motive's subsequent failure to correct Dr. Wicker's misstatement that Khan, rather than Johns, testified to that effect. (*See* Tr. at 796:25-797:18 ("A: [Khan] did say that. It is in his deposition.").) But Omnitracs cured this misstatement during its cross examination of Dr. Wicker by clarifying that Khan never gave a

11

deposition. (*See* Tr. at 883:14-24 ("Q. Do you remember that Mr. Khan was not actually deposed at all in this case? He didn't give a deposition? A. That's correct.").) Omnitracs also had the opportunity on cross to further clarify that Johns, not Khan, testified about Khan's reason for using the alias, but chose not to do so, presumably because that additional point would be of limited relevance once it was established that Khan himself had not been deposed.

### B.     Makani's Reference to a Legal Investigation

Makani's violations of the Court's motion in limine order did not result in prejudice because the offending testimony was promptly struck and Makani was "significant[ly] sanction[ed]." (Trial Tr. at 1065:18-1066:3, 1074:18-23.) The Court had previously precluded Motive from "present[ing] any evidence of its investigation in response to the 2018 notice letters, because Motive has declined to provide discovery on that topic and has asserted attorney-client privilege over it." (Dkt. No. 392 at 9.) During his direct examination, Makani violated the order twice—within a fairly short amount of time—by stating that he had forwarded the patents onto Motive's legal team. (Trial Tr. at 1023:11-14, 1027:5-8.) Each time, the Court promptly instructed the jury to disregard that testimony and stated that Makani had violated the Court's orders. (Trial Tr. at 1026:5-9, 1034:1-5.) Following these instructions, Makani's demeanor in Court had noticeably changed—his tone grew quieter and he appeared much more tentative and uncomfortable. The Court took this shift in demeanor into account in determining that the sanction imposed was sufficiently severe. Moreover, to issue a more severe sanction would have risked potential unfair prejudice to Motive. A key issue at trial was whether Motive willfully disregarded patent laws in the alleged infringement, and additional instructions regarding the violation of court orders by Motive's CEO could have unduly prejudiced the jury as to that issue. The jury was specifically instructed at the beginning and end of the trial not to consider any testimony stricken from the record, and there is no basis to believe they disregarded that instruction.

Omnitracs also raises for the first time an objection to Motive's questioning of Makani about Motive's October 15, 2018 letter. (*See* Trial Tr. at 1036:24-1037:3 ("Q: And she says

next: 'That maybe outside counsel should talk about patents.' Right? A: Yes." (referring to Dkt. No. 493-142 (Ex. 1965))).)  Omnitracs contends that Motive improperly revealed text that had been redacted from that letter.  While admittedly close to the line, Motive's questioning did not reveal anything that could not have been reasonably inferred from the unredacted portions of the letter, which Omnitracs admitted into evidence.  (*See* Ex. 1965 (letter stating that "it may make sense to set a meeting to allow Omnitracs to present on the specifics of how or why it believes its patents would be of interest to KeepTruckin. . . . Let us know if a sit-down meeting would be of interest, and we can ask *our respective lawyers* to shepherd schedules." (emphasis added)).)  Motive's counsel did not specifically state that Motive had retained outside counsel, which would have been prohibited by the redactions.  In any event, Omnitracs' failure to object to Motive's questioning during trial constitutes waiver. *Mitchell v. Black & Decker (USA) Inc.*, 6 Fed. App'x. 652, 653 (9th Cir. 2001) (holding that absent a showing of gross injustice or an explanation of the failure to object, a defendant's failure to object to an alleged error generally precludes him from asserting the claimed error in a motion for new trial).

### C.     Bifurcation of the Verdict Form

The Court's decision to bifurcate the case with a two-part verdict form was proper given the complexity of the case.  Courts have broad discretion to bifurcate trials under Federal Rule of Civil Procedure 42(b).  *See Estate of Diaz v. City of Anaheim*, 840 F.3d 592, 603 (9th Cir. 2016).  In deciding whether to bifurcate, courts generally consider whether (i) the issues are separable, (ii) the trial would confuse the jury, (iii) the issues are complex, and (iv) judicial economy is improved or hindered.  *Mformation Techs., Inc. v. Research in Motion Ltd.*, No. C 08–04990, 2012 WL 1142537, at *1-*2 (N.D. Cal. March 29, 2012).  This trial involved four patents, ten distinct claims, multiple infringement and invalidity theories, willful infringement, and lost profits and reasonable royalty damages calculations.  The Court's first proposed verdict form, pre-bifurcation, was ten pages long and contained many instructions that required jurors to assess their prior answers and navigate the form accordingly.  (Dkt. No. 388-1.)  In light of these circumstances, the Court exercised its discretion to issue a two-part verdict form, which would

be "simpler," 'more efficient," and less confusing for the jury. (*See* Dkt. No. 420 at 1; Trial Tr. at 1768:11-13.)

Omnitracs further takes issue with the Court's analogizing of the verdict form to a "choose-your-own-adventure" book, which it contends encouraged the jury to find non-infringement so they could skip part two of the verdict form. But Omnitracs did not raise this objection during the trial or ask for a corrective instruction to the jury. And even if it did, the Court's "choose-your-own-adventure" analogy did not instruct the jury to choose the path of least resistance. To the contrary, in conjunction with the other instructions, the analogy explained that the jury needed to carefully follow the instructions at each step and determine, based on their prior answers, whether to answer or skip subsequent questions. (*See, e.g.*, Trial Tr. at 1766:10-13 ("There is a choose-your-own-adventure component to this in that, as you're going through, it will give you instructions as to what question to answer next and in what order."); Dkt. No. 430 at 26 (the Court explaining what it planned to say to the jury at the final pretrial conference).) Those instructions applied to numerous aspects of the complex verdict form, which resulted from trying ten claims across four patents to the jury, and did not relate only to the bifurcated portion of the form. The Court also articulated to the jury that they should "not read into the verdict form, the two-part process, or these instructions that [the Court has] an opinion regarding the evidence or what your verdict should be." (Trial Tr. at 1765:19-23.)

Nor is Motive's counsel's statement during closing argument that "[a] finding of non-infringement for Motive ends the case[, as] [i]n-the-choose-your-own-adventure, it's the everyone-gets-to-go-home choice" sufficiently prejudicial to warrant a new trial. (Trial Tr. 1811:22–24.) Again, Omnitracs should have raised their objection at trial. While the statement is on the border of what is acceptable, the Court did not find it so prejudicial as to require a sua sponte order to strike. The statement did not cross the line into urging the jury to violate their duty to render a verdict based on the evidence and the law, which would have been contrary to the other instructions given to the jurors throughout the case. Nor is there any evidence that the jury actually did violate that duty. And, of course, the jury would have been aware that a finding

14

of non-infringement would have ended deliberations prior to reaching damages issues, regardless of whether the verdict form was bifurcated.

Lastly, Omnitracs argues that the Court's statement to the jury prior to deliberations that they would be released at midday on Friday, April 25, 2025, was prejudicial because it somehow suggested to the jury that part two of the verdict form could be especially burdensome and time consuming. (Trial Tr. at 1845:19-25.) There is no basis for that conclusion. The parties had previously agreed to this trial schedule, and the Court had previewed the schedule with the jury earlier in the case during the defense case, when there was no indication of when deliberations might begin or how long they would last. (Trial Tr. at 1470:10-24.)

### D. Other Conduct

Omnitracs also challenges a host of other conduct. None of the conduct is prejudicial, let alone warrants a new trial.

*First*, Omnitracs contends that Motive improperly argued that the "driver information" transmitted to the Vehicle Gateway ("VG") needs to be same "driver information" as the username and password input by the user. But that is in fact in line with the Court's construction that "the 'driver information' transmitted be the same 'driver information' whose inputs were accepted." (Dkt. 465-1 at 7.) While the construction also provided that the "inputs of driver information" need not be the "same sequence of data as what is transmitted to the data acquisition device," Motive did not argue that it did not infringe because the sequence of data had changed. (*Id.*) Motive's expert Wilson testified as to why the Driver ID Motive sends to the VG is *qualitatively* a different piece of driver information from the username and password. (Trial Tr. at 1307:22-1308:1.)

*Second*, Omnitracs argues that Motive's expert Andrews improperly testified that the preamble of Claim 1 of the '253 Patent is limiting. That does not provide a basis for a new trial. Omnitracs had not requested any construction of the preamble at claim construction or in motions in limine. Accordingly, at the time Motive's expert testified, the Court had not provided any instruction to the jury on that point. Nor did Omnitracs request one at the time or seek to

15

strike Andrews' testimony. Instead, Omnitracs aptly cured the issue in the moment by obtaining an admission from Andrews that "[i]f the preamble isn't a requirement, yes, this argument would go away because the claim would be irrelevant." (Trial Tr. at 1478:10-1480:8). After the close of evidence, Omnitracs requested for the first time an instruction that the preamble was not limiting, which was granted and included in the final jury instructions. Omnitracs then featured the instruction prominently in its closing argument on the issue.

*Third*, Omnitracs asserts that Motive improperly suggested that Sekula and the XRS inventors committed inequitable conduct by failing to submit Turnpike source code to the Patent Office. But Motive's references were not made as an inequitable conduct accusation, which is not at issue in this case. Rather, they were a legitimate rebuttal to Wicker's testimony that the PTO considered "all" Turnpike prior art and a proper attempt by Motive to defend its invalidity arguments. (*See* Trial Tr. at 1630:13-17 ("Q: [Y]ou would agree that Mr. Wilson is using a different document regarding Turnpike to prove invalidity in this case than the ones that were submitted to the Patent Office; correct? A: That I'm not certain about."); *see also id.* at 1592:10-18.)

*Fourth*, Omnitracs contends Motive misrepresented the extent of Dr. Wicker's source code review by obfuscating the difference between reviewing source code on a computer and reviewing printouts. However, to the extent any obfuscation occurred, Omnitracs did not object, and further had ample opportunity to clarify or rebut any such impression during its redirect and cross-examination. Indeed, on redirect, Dr. Wicker was asked about the suggestion that he had only spent seven to eight hours reviewing source code. He testified, "I spent a day with the source code computer. . . . I spent a day identifying code that I wanted printed out. The printouts were handed to me. I spent a little over 50 hours studying the printouts and the code. So I had quite a bit of time with the source code." (Trial Tr. at 881:10-22.) It is difficult to imagine the jury was confused by the straightforward testimony on that issue.

*Fifth*, Omnitracs asserts that Motive's references to the absence of evidence of theft or misappropriation unfairly prejudiced the jury. But Motive was entitled to defend itself against

Omnitracs' allegations of willfulness and copying, especially as Omnitracs placed Motive's hiring of former XRS employee Dan Fuglewicz at the core of their case. (*See* Trial Tr. at 822:14-825:23.)

### E. Weight of the Evidence

For the reasons described above, the jury's verdict that Motive's products did not infringe the asserted claims of the '628, '060, and '253 Patents is supported by substantial evidence and is not against the weight of the evidence.

Nor was the jury's verdict that Motive did not infringe the asserted claims of the '906 Patent "contrary to the clear weight of the evidence." *See Molski*, 481 F.3d at 729. The evidence at trial supported a conclusion that "distance driven" was a factor in calculating the DRIVE score and that this factor was not within the closed group of factors listed in the asserted claims. (*See, e.g.*, Trial Tr. at 1257:3-1259:16 (Znidarsic stating that "miles driven was a factor; albeit a normalization factor, but still a factor"); Trial Tr. at 852:4-854:2 (Dr. Wicker admitting that distance driven "has an effect on the driver's score" and is a "normalization factor").) While Omnitracs' witnesses opined that "distance driven" was a weight rather than a factor, the jury's determination to believe instead the testimony describing it as a factor is not contrary to the clear weight of the evidence.

Accordingly, there is no basis for a new trial on these grounds.

**IT IS SO ORDERED.**

Dated: August 5, 2025

RITA F. LIN
United States District Judge